Estate of Harriet M. Harris, Albert J. Stearns, LeRoy C. Luce, Executors v. Commissioner.
Estate of Harris v. Commissioner
Docket No. 3361-62.
United States Tax Court
T.C. Memo 1964-109; 1964 Tax Ct. Memo LEXIS 226; 23 T.C.M. (CCH) 635; T.C.M. (RIA) 64109; April 24, 1964
Henry H. Hastings, for the petitioners. J. Frost Walker, Jr., for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency of $9,431.40 in estate tax. The issues are: (1) Whether certain charitable bequests in remainder after a life estate are deductible under Section 2055(a) of the 1954 Code where the principal was subject to invasion "for the support, comfort and happiness" of the life beneficiary; and (2) whether the credit balances, or any portion thereof, in four joint bank accounts *227 in the names of decedent and her brother are includable in the decedent's gross estate. Findings of Fact Some of the facts have been stipulated, and, as stipulated, are incorporated herein by reference. Harriet M. Harris (hereinafter sometimes referred to as the decedent) was born on December 31, 1873, and died testate on December 22, 1959. She was survived by her brother, John Harris, who was born on June 19, 1870 and died on July 3, 1961. The last will and testament of decedent was executed by her on March 24, 1959. A codicil to the will was executed by her on September 21, 1959. Albert J. Stearns and Leroy C. Luce are the duly qualified executors of the will of decedent. On March 21, 1961, in their fiduciary capacity, they filed with the district director of internal revenue, Augusta, Maine, an amended estate tax return for the estate of the decedent. The will of decedent, after providing for the payment of her just debts, funeral charges and expenses of administration, contained the following provision: First: I give, bequeath and devise all the property with which I may die seized or possessed, * * * unto Leroy C. Luce and Albert J. Stearns, both of Norway, in the *228 said County of Oxford, in trust, however, for the use and benefit of my brother, John Harris, of said Bethel, for and during the term of his natural life, and I direct that said trustees shall keep all securities left by me safely invested, and shall use such portion of the income thereof, or the entire amount thereof, together with any portion of the principal that shall be necessary for the support, comfort and happiness of my said brother during the term of his natural life, and at his decease I direct said Trustees or their successors to make the following distribution of whatever remains of my said estate, which is in accordance with a thorough understanding which my said brother and I have jointly determined upon for the disposition of our joint estates, viz: * * *
Decedent's will then provided for 23 gifts of money, securities, and other property, some of which were to religious, charitable and public organizations. In the estate tax return the amount claimed as a deduction for charitable, public, and similar gifts was $52,672.82. This deduction was disallowed by the respondent. The reason given for the disallowance was that "the value of the charitable beneficial interest *229 was not presently ascertainable at the date of death of the decedent and hence not severable from the noncharitable interests". The decedent and her brother John had left Maine to live in the area of Boston, Massachusetts, at some time after or around the turn of the century. He worked for 27 years, until 1930, for the Revere Rubber Company, where he ultimately became a superintendent. His salary was $1,835 in 1921 and $2,260.55 in 1925. Harriet kept house for her brother, looking after his affairs. She was gainfully employed only for a very short time, perhaps for only a few weeks, by Jordan Marsh. The decedent and her brother had inherited some money or property at some undisclosed time and in undisclosed amounts. John owned some real estate and was engaged to some extent in activities involv-the real estate at least as far back as 1911. Harriet and her brother lived frugally. Their total living expenses averaged $22.37 a week in 1930. Earnings in excess of living expenses were placed in various bank accounts over the years which were drawn upon from time to time for various investments in corporate securities and possibly additional real estate. The decedent and her brother *230 each owned securities, and dividends therefrom were deposited in various bank accounts, as were also rentals from real estate. The decedent and her brother returned to live in Maine about 1940 or 1941. They continued to live together. Neither was thereafter gainfully employed. At one time, when they lived in Massachusetts, they had kept certain separate bank accounts, but thereafter they had a number of joint accounts, and at the time of decedent's death they had four joint accounts in Maine with balances as follows: Norway Savings Bank, $16,297.24; Bethel Savings Bank (account no. 7194), $7,271.88; Bethel Savings Bank (account no. 7199), $8,225.64; and Casco Bank and Trust Co., $2,729.40. Although it is possible to trace the balances in these accounts or parts thereof from one account to another, or to other joint accounts since closed, either in Maine or in Massachusetts, it is not possible on the record to trace the balances in these four accounts to any separate account of either the decedent or her brother, or to determine precisely the ultimate source of all of the funds in these four accounts. The amended estate tax return included one-half of each of the foregoing four *231 accounts in Harriet's gross estate. The Commissioner included in her gross estate the entire balance in each of the last three accounts and $9,553.54 in respect of the Norway Savings Bank account. By amendment to the petition, petitioners allege that only $1,010.91 of the Norway Savings Bank account is includable, and that no part of either of the Bethel Savings Bank accounts is includable in the gross estate. The following table shows the accounts in question, the balances at the date of decedent's death, and the amounts includable in the gross estate upon the basis of the petitioners' positions and the Commissioner's determination: Extent
Amount
Amount
Withdrawal
included
determined
includable
Joint Accounts
value
in gross
by respondent
pursuant to
estate by
in names of
at date of
amended
to be
amendment
Estate
includable
decedent and brother
decedent's
Tax Return
in gross
to petition
death
estate
Norway Savings Bank,
Account
No. 28093
$16,297.24
$8,148.62
$9,553.54
$1,010.91
Bethel Savings Bank,
Account
No. 7194
7,271.88
3,635.94
7,271.88
0
Bethel Savings Bank,
Account
No. 7199
8,225.64
4,112.82
8,225.64
0
Casco Bank & Trust
2,729.40
1,364.70
2,729.40
1,364.70
Co. Checking Acct.
*232 Fifty percent of each of the balances in the four joint accounts at the date of Harriet's death originally belonged to or was attributable to funds owned by John. The value of Harriet's gross estate, as reported in the amended estate tax return was $146,641.96 as of her date of death, and $122,660.71 as of the alternative valuation date. At the time of Harriet's death, John was 89 years of age and in poor health. He had difficulties with ulcers on his legs, he had a heart condition, and at that time did not leave his house. He had frequent medical attention and at some point thereafter he was seen daily by a doctor. On January 7, 1960, shortly after Harriet's death, John transferred all his assets, including the four bank accounts referred to above, to Albert J. Stearns and Leroy C. Luce irrevocably in trust for his own benefit. Those assets had a value of approximately $67,618.80 at that time. The trust instrument was designated a "Living Irrevocable Trust". It recited that Harriet had assisted John during her lifetime in handling his financial affairs, that he was in need of the assistance formerly rendered by her and that he had full faith and confidence that the trustees *233 would look after his financial and personal affairs. During the period of approximately 18 months up to John's death, the trustees expended $11,677.74 in his behalf out of John's "Living" trust; that amount was approximately $8,000 in excess of the income realized by the trust during that period. In addition, the trustees of Harriet's testamentary trust expended $2,730 on John's behalf prior to his death; the total income of the testamentary trust during that period was $6,960. Opinion RAUM, Judge: 1. Charitable deduction. The gifts to charity were in remainder after a life estate and the principal was subject to invasion for the "support, comfort and happiness" of the life tenant. In view of such power of invasion that could wipe out the charitable gifts in remainder, we hold that there was no ascertainable standard by which the value of such gifts could reasonably be determined and that the deduction therefor must be disallowed. The case is ruled by Merchants Bank v. Commissioner, 320 U.S. 256, and Henslee v. Union Planters Bank, 335 U.S. 595. The use of the word "happiness" introduces a subjective standard that is so broad as to be incapable of being *234 reasonably confined within any ascertainable limits. See Estate of Mary Cotton Wood, 39 T.C. 919, 923. The pivotal consideration is the existence of such power of invasion, not the likelihood of its exercise. See Henslee v. Union Planters Bank, supra, 335 U.S. at p. 598; Commissioner v. Merchants Bank, 132 F. 2d 483, 486 (C.A. 1), affirmed, supra, 320 U.S. 256; Third National Bank & Trust Co. v. United States, 129 F. Supp. 442, 444 (D. Mass.), affirmed, 228 F. 2d 772 (C.A. 1). It is only where the power of invasion is limited by measurable standards that the likelihood of its exercise may become pertinent. Cf. Estate of Mary Cotton Wood, supra, 39 T.C. at p. 924; Estate of Oliver Lee, 28 T.C. 1259. Petitioners' reliance upon United States v. Powell, 307 F. 2d 821 (C.A. 10), is misplaced. That case, involving a somewhat different issue, gave a more restrictive meaning to the word "happiness" than is usually found, and the court relied in part at least upon indications in the trust instrument that the power to invade "should be exercised with restraint and only when *235 the purpose justified a reduction of the corpus". 307 F. 2d at p. 828. We do not find in the Powell case any reason to depart from the results called for by Henslee v. Union Planters Bank and the Merchants Bank case, and we note that petitioners' brief makes pointed reference to the dissenting opinions in these cases. 2. The four joint accounts. The issue here is solely one of fact: What was the source of the funds in these accounts? To the extent that such funds had their source originally in John they are not includable in Harriet's gross estate. Section 2040, Internal Revenue Code of 1954. It is impossible on the record before us to trace all of the funds in these four accounts to their ultimate source. We are satisfied that at least a portion of them was attributable to John's earnings in Massachusetts. Although John's salary was modest, he and his sister lived frugally, and it seems quite likely that the savings therefrom over the years, profitably invested and reinvested, as indicated by the evidence, resulted in a comparatively substantial accumulation. On the other hand, the record also shows that Harriet had inherited some money or *236 property, that she owned securities, that during at least several years prior to her death the dividends from her securities exceeded the dividends from John's securities that were deposited in their joint accounts. In view of the unsatisfactory state of the record on this issue, it is incumbent upon us to do the best we can with the materials at hand, and, bearing in mind petitioners' burden of proof, we have found as a fact that fifty percent of each of the balances in the four joint accounts at Harriet's death originally belonged to or was attributable to funds owned by John. That portion of these accounts may not be included in Harriet's gross estate. Decision will be entered under Rule 50.